# Exhibit "1"

Julia Teague vs. Omni Hotels Management Corp, et al.
Julia Teague - March 02, 2020

Page 1

```
               UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
                     AUSTIN DIVISION
JULIA TEAGUE,            )
                         )
    Plaintiff,           )     C.A. NO.
                         )
VS.                      )     1:19-cv-940
                         )
OMNI HOTELS MANAGEMENT   )
CORPORATION, and         )     Jury Trial Demanded
TRT HOLDINGS, INC.       )
                         )
    Defendant.           )
***********************************************
         ORAL AND VIDEOTAPED DEPOSITION OF
                    JULIA TEAGUE
                   MARCH 2, 2020
***********************************************
```

   ORAL AND VIDEOTAPED DEPOSITION OF JULIA TEAGUE, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the 2nd day of March, 2020, from 9:38 a.m. to 12:40 p.m., and from 1:43 p.m. to 5:10 p.m., before Katherine A. Buchhorn, Certified Shorthand Reporter in and for the State of Texas, reported stenographically, at the law offices of KAPLAN LAW FIRM, PLLC, 406 Sterzing Street, Austin, Texas 78704, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

Page 2

APPEARANCES

FOR THE PLAINTIFF, JULIA TEAGUE:

FOR THE DEFENDANTS, OMNI HOTELS MANAGEMENT
CORPORATION, and TRT HOLDINGS, INC.:

   RACHEL POWITZKY STEELY
   FOLEY GARDERE/FOLEY & LARDNER LLP
   1000 Louisiana
   Suite 2000
   Houston, Texas 77002
   713.276.5500
   rsteely@foley.com

VIDEOGRAPHER:

   NANCY MARTIN
   MARTIN LEGAL VIDEO
   pmartin@martinlegalvideo.com

ALSO PRESENT:

   Carissa Smith

Page 3

I N D E X
                                          PAGE
Appearances. . . . . . . . . . . . . . . .   2
Stipulations . . . . . . . . . . . . . . .   4
Exhibits . . . . . . . . . . . . . . . . .   5
Requested Documents/Information. . . . . .   9

JULIA TEAGUE
Examination by Ms. Steely. . . . . . . . .   9

Reporter's Certificate . . . . . . . . . . 269

Changes & Signature. . . . . . . . . . . . 271

Acknowledgement of Deponent. . . . . . . . 272

Page 4

STIPULATIONS

   The attorneys for all parties present stipulate and agree to the following items:

   That the deposition of JULIA TEAGUE is being taken pursuant to Notice;

   That the deposition is being taken pursuant to the Federal Rules of Civil Procedure;

   That pursuant to FRCP Rule 30(e)(1), the signature of the deponent was requested by the deponent or a party before the completion of the deposition;

   That the original transcript will be submitted electronically for signature to the witness' attorney(s), MATTHEW "MAFF" CAPONI and AUSTIN KAPLAN, and that the witness or the witness' attorney(s) will return the signed jurat and errata sheets to KATHERINE A. BUCHHORN, CSR, within 30 days of the date the electronic transcript is provided to the witness' attorney.  If not returned, the witness may be deemed to have waived the right to make the changes, and an unsigned copy may be used as though signed.

Katherine A. Buchhorn, CSR
512-574-2455                               BuchhornCSR@gmail.com

Case 1:19-cv-00940-ADA  Document 39-1  Filed 09/21/20  Page 3 of 11
Page 4 (Pages 13-16)

Julia Teague vs. Omni Hotels Management Corp, et al.
Julia Teague - March 02, 2020

Page 13

1   A.  I'm not -- I'm not sure about that.  I was on
2 the FMLA when that announcement came out, so...
3   Q.  When you say "when that announcement came out,"
4 what are you talking about?
5   A.  The announcement that Peter would replace Jim
6 Caldwell as president.
7   Q.  Okay.  But when you -- prior to the time you
8 went on FMLA, I guess -- your second or your first FMLA
9 leave?
10   A.  My second.
11   Q.  Okay.  Prior to the time that you were on your
12 second FMLA leave, Jim Caldwell was the president of
13 Omni; is that right?
14   A.  Yes.
15   Q.  Okay.  And your understanding, he was a shared
16 executive between TRT Holdings and Omni?
17   A.  No.  That was not -- that's not what I said.
18   Q.  Okay.  Great.  Okay.  Let me make sure I'm
19 clear.
20       You said that your -- you understood
21 TRT Holdings -- is it your understanding TRT Holdings
22 and Omni share some executives?
23   A.  What -- what I'm saying is that they would
24 transfer.  So when Jim was replaced by Peter as the
25 president of Omni Hotels, Jim then went to TRT Holdings.

Page 14

1   Q.  Got you.  Okay.
2   A.  And that's where I'm not sure what exact role
3 he held but...
4   Q.  Are you aware of anyone who actually shared a
5 position with TRT and Omni at the same time?
6   A.  I don't -- I guess with Peter's reporting in to
7 somebody from TRT, that might indicate a shared
8 employee.
9   Q.  Okay.  That's what your understanding was, as
10 far as the reporting relationship; is that right?
11   A.  I understand that Peter was reporting in to
12 Blake and Bob Rowling.
13   Q.  Okay.  When did you start employment at Omni?
14   A.  With Omni or at Barton Creek Resort?
15   Q.  At -- with Omni.
16   A.  The resort was acquired by Omni in mid 2013.
17   Q.  And so you were already working at Barton Creek
18 Resort, correct?
19   A.  Yeah.  That's correct.
20   Q.  And so when did you start at Barton Creek?
21   A.  I started at Barton Creek in April of 2012.
22   Q.  And what was your position when you started in
23 April of 2012 at Barton Creek?
24   A.  Director of marketing communications.
25   Q.  And what did the -- what was the -- did the job

Page 15

1 duties entail of director of marketing communications?
2   A.  That's a lot of --
3   Q.  Yeah.
4   A.  -- a lot of job responsibilities.  But I would
5 say, primarily, it was to drive the strategy for -- for
6 Barton Creek, the marketing strategy for Barton Creek.
7 And then under that falls digital marketing, website
8 management, communications, and PR strategy, social
9 media.  And there's probably a lot more that I'm not
10 including here.
11   Q.  So did, at some point, your job title change
12 when you were at Omni?
13   A.  Once Omni acquired the resort, they already had
14 some directors of marketing within their existing
15 portfolio, and that's how they referred to the position
16 was director of marketing.
17   Q.  So, first, it was marketing communications --
18   A.  Director of marketing communications.
19   Q.  -- and then it became director of marketing?
20   A.  That's what I started to be referred to as,
21 yes.
22   Q.  Same job duties?
23   A.  Yes.  I -- actually, I would say that once Omni
24 acquired the resort -- primarily, the responsibilities
25 were similar; but there was more of a branding aspect to

Page 16

1 it because Omni was a brand versus KSL Resorts.
2   Q.  When you began your employment in 2012, who
3 your supervisor?
4   A.  John Blanton.  He was the director of sales and
5 marketing.
6   Q.  And who are the different -- can you just kind
7 of go -- you can just do it from a timeline.  Who were
8 your different supervisors when you were working at
9 Barton Creek?
10   A.  John Blanton, initially, then Libby Nations,
11 and then Carissa Smith.
12   Q.  I'm going to switch gears a little bit and go
13 into your background just a bit.
14       Where did you work before Barton Creek?
15   A.  Just prior to Barton Creek I worked at a
16 communications agency called Cohn & Wolfe; a global
17 communications agency.
18   Q.  And what is a global communications agency?
19   A.  A communications agency that supports clients
20 across the globe.
21   Q.  Did you have any hotel clients at the time?
22   A.  Yes.  I worked on the Hilton business for seven
23 years.  Or nearly seven years.
24       MS. STEELY:  Easier to do it this way.
25       (Exhibit No. 1 marked)

Case 1:19-cv-00940-ADA   Document 39-1   Filed 09/21/20   Page 4 of 11

Page 5 (Pages 17-20)

Julia Teague vs. Omni Hotels Management Corp, et al.
Julia Teague - March 02, 2020

Page 17

1  Q. (BY MS. STEELY) I'm just going to hand you
2  what's been marked as Exhibit 1. Do you recognize
3  Exhibit No. 1?
4  A. Yes.
5  Q. And what is it?
6  A. It looks to be a copy of my resumé.
7  Q. Now, I'm going to -- see the bottom right hand,
8  there's these numbers?
9  A. Uh-huh.
10 Q. And I'm going to refer to those a lot of times
11 as "Bate numbers." And it says Teague 165. And if you
12 look, it goes all the way through Teague 169.
13 A. Okay.
14 Q. And I'll represent to you these are
15 documents -- when it says "Teague" on it, those are
16 documents that you and your counsel provided to the
17 defendants or produced to the defendants.
18 A. Okay.
19 Q. Do you see that?
20 A. Yeah.
21 Q. All right. So we have here Teague 165 through
22 169.
23       Are there any particular differences for
24 these four various copies? And also, so you know, since
25 we're trying to save some trees today, we've done a lot

Page 18

1  of two-sided exhibits.
2  A. Okay.
3  Q. So you're welcome to take a look at it,
4  whatever you need to do.
5  A. So there's several different copies. So are
6  you asking me to compare one specific one --
7  Q. I'm just asking you -- there is -- is there any
8  particular date -- I've got four different copies, four
9  different items. I don't see, really, any differences
10 between them. Is there a particular difference that you
11 have with them --
12 A. It looks like --
13     (Simultaneous discussion interrupted by
14    the Reporter)
15     MS. STEELY: Yeah.
16     THE WITNESS: Sorry.
17 Q. P(BY MS. STEELY) Go ahead.
18 A. It looks to me like the one marked 167 --
19 Q. Yes.
20 A. -- I had added Marriott International
21 experience at that point.
22 Q. Okay. So with -- when we're looking at 165
23 through 169, which is the form that you submitted to
24 Omni?
25 A. I can't be certain.

Page 19

1  Q. Okay. And when did you start using the 167,
2  which it has the Marriott added to it?
3  A. I don't recall the exact date I started using
4  this version.
5  Q. Do you recall the time period that you started
6  using it?
7  A. No.
8  Q. After you worked at Omni, you started working
9  at Marriott, correct?
10 A. Correct.
11 Q. Okay. How long were you working at Marriott
12 before you started looking for another job?
13 A. Well, when I heard from Carissa that the job at
14 Barton Creek had been reposted. If that's considered
15 looking for another job, then it would be at that point.
16 Q. Okay. And then after -- other than the Omni
17 position, did you start -- when did you start applying
18 for other positions when you were working at Marriott?
19 A. I believe we've provided you all of the dates
20 of positions that I sought out. Is that something I can
21 reference?
22 Q. I don't have it here. I'm asking you to the
23 best of your recollection, sitting here today.
24 A. Best of my recollection, I believe I applied
25 for positions as soon as May/June/July. I knew pretty

Page 20

1  quickly that Marriott wasn't a position I wanted to stay
2  in.
3  Q. So what were you -- after you left Omni and
4  began working at the Marriott, what were you doing for
5  Marriott?
6  A. I was supporting 10 to 11 hotels with marketing
7  functions.
8  Q. And when you say you were supporting 10 to 11
9  hotels with marketing functions, what does that entail?
10 A. It would entail marketing strategy. It would
11 entail -- really, any kind of marketing support that
12 that hotel needed, I would be there to provide.
13 Q. Did you have an office?
14 A. I worked remotely.
15 Q. You worked -- so you worked remotely. Did you
16 travel quite a bit?
17 A. I did.
18 Q. Why did you believe that this wasn't working
19 for you at Marriott?
20 A. There were a couple of reasons it wasn't a good
21 fit for me. I think the first reason is that it was a
22 lot more travel than what I had initially intended or
23 what I understood the position to be, which was very
24 difficult for me with also juggling a newborn baby.
25 Q. Uh-huh.

Case 1:19-cv-00940-ADA   Document 39-1   Filed 09/21/20   Page 5 of 11

Page 35 (Pages 137-140)

Julia Teague vs. Omni Hotels Management Corp, et al.
Julia Teague - March 02, 2020

## Page 137

1  April, it was an unpaid FMLA leave --
2   Q.  Right, but you --
3   A.  -- just to be fair.
4   Q.  -- went back to -- well, you were on F -- yes,
5  because FMLA leave doesn't have to be paid, correct?
6   A.  Correct.
7   Q.  All right.
8   A.  Yes.
9   Q.  So -- but when you came back on April 24th, you
10 were paid for that week, correct?
11  A.  I believe so.
12  Q.  Yes.  Okay.  By Omni.
13     And so I'm trying to get the timelines --
14  A.  Uh-huh.
15  Q.  -- so -- understanding.
16     So you were allowed to take your entire
17 FMLA not interrupted, correct?
18  A.  Yes.
19  Q.  You actually came back to work on April 24th
20 and finished out your family and medical leave, correct?
21  A.  Yes.
22  Q.  And then you were at work one more week, and
23 then you were gone.  Is that fair?
24  A.  Yes.
25  Q.  Is that correct?

## Page 138

1   A.  Yes.
2   Q.  Is that a -- I just want to make sure we're --
3   A.  Yes, that's correct.
4   Q.  -- agreeable on the dates and on the timeline.
5   A.  Uh-huh.  Yep.
6   Q.  So if we look at your pregnancy -- and I want
7  to talk about your pregnancy-related claims.
8   A.  Uh-huh.
9   Q.  Is it your contention that you were not hired
10 for the position in November of 2018, based on the
11 pregnant -- your pregnancy that concluded on
12 February 2nd, 2018?
13  A.  Yes.
14  Q.  So that -- there's an eight-month gap between
15 the time you were pregnant and the time the position was
16 filled, correct?
17  A.  Yes.
18  Q.  How is your pregnancy that occurred eight
19 months before related to you not being hired for a
20 position -- the director of marketing position in
21 November 2018?
22  A.  I was told that the position -- when they
23 reposted it, that the position was slated to return in
24 July, and then Omni delayed the hiring until November.
25 So the position was posted, I believe, in early June,

## Page 139

1  which is just one month after the end of my FMLA leave.
2   Q.  It was posted but it wasn't filled, correct?
3   A.  I was told that it was slated to be filled in
4  July -- July/August time frame.
5   Q.  But it wasn't, right?
6   A.  Correct.
7   Q.  And, in fact, there -- Omni Barton Creek Resort
8  did not have a director of marketing position from --
9  let me go back.
10     They didn't have a director of marketing
11 position that was filled during your time on FMLA,
12 correct?
13  A.  Omni did not have the director of marketing
14 position.  They had the responsibilities of the director
15 of marketing.
16  Q.  Okay.  So let me -- let me just say that --
17 let's do this.  They didn't have anyone actually engaged
18 in the role of director of marketing position during
19 your FMLA leave, correct?
20  A.  I wasn't there, so --
21  Q.  Right --
22  A.  -- it's hard for me to say.
23  Q.  Right.  So then you left.  Your last day of
24 employment on April 30th, 2018, correct?
25  A.  Correct.

## Page 140

1   Q.  And the -- there was not a director of
2  marketing position from the time you left on April 30th
3  until someone was hired in November of 2018, correct?
4   A.  I don't believe there was a person employed as
5  a director of marketing during that time, but I believe
6  the job responsibilities remained.
7   Q.  And the responsibilities -- and who did the
8  responsibilities fall to?
9   A.  I believe, Carissa Smith.
10     (Off the record discussion)
11  Q.  (BY MS. STEELY)  So it was -- was it your
12 understanding that the director of marketing position
13 was actually eliminated during the reduction in force?
14  A.  That's what I was told.
15  Q.  Okay.  And I know that's what you were told,
16 but did you actually understand there was nobody in that
17 position during the time from the time you left,
18 April 30th, until November; that it was gone?  The
19 position was gone?
20  A.  I -- I wasn't there, so I can't speculate on
21 that.
22  Q.  Okay.  So you can't -- you can't say one way or
23 the other?
24  A.  No.  I mean, I wasn't there.
25  Q.  All right.  So with regard to this -- to the

Julia Teague vs. Omni Hotels Management Corp, et al.
Julia Teague - March 02, 2020

Page 149

1  possibility of, you know, being nine months pregnant and
2  knowing that I had a limited time frame before I was
3  going to be out of commission.  I -- there may have been
4  other ones.  I'm not positive.
5      Q.  Do you -- when you said that -- let's keep
6  going with the timeline.  I think it's easier.
7          So we were talking about this job.  Did
8  you apply -- you applied for several other positions,
9  correct, with other companies?
10     A.  Yes.
11     Q.  Yeah.
12     A.  Uh-huh.
13     Q.  And I'm not going to sit here and go through
14 every single one of them --
15     A.  Thank you.
16     Q.  -- but in the time period that you were looking
17 for work, did you apply for any positions outside the
18 Austin area?
19     A.  I don't believe so.
20     Q.  In 2018, did you apply for any positions
21 outside the Austin area?
22     A.  No.
23     Q.  Okay.  Since you've left Omni, have you applied
24 for any positions outside the Austin area?
25     A.  When you say "outside of the Austin area,"

Page 150

1  based outside of the Austin area or -- because my --
2      Q.  Yes.
3      A.  -- role now, there's -- you know, I'm
4  overseeing divisions in Austin, Houston, Dallas, and
5  San Antonio; so there's work in other places outside of
6  Austin.
7      Q.  Right.  And you're right.  It's based out of
8  Austin.
9          Did you apply for any positions where you
10 would not be based out of Austin?
11     A.  I don't believe so.
12     Q.  And was it important for you to stay based out
13 of the Austin area in -- with these positions?
14     A.  It was my preference.
15     Q.  Yeah.  When you were working with Omni, did you
16 provide Omni with -- with -- with information that you
17 were not amenable to being relocated in another town?
18     A.  I think that there was a time period where we
19 did a succession plan, and it was kind of -- the idea
20 was to think forward in your career, and that there was
21 a drop-down or, you know, some kind of "Are you
22 relocatable?"  And at that time my husband was in the
23 Army, and we were not relocatable.
24     Q.  Okay.  At this -- at the time that you were
25 applying for these other positions, though, you did not

Page 151

1  reach out to try to do anything that was out of the
2  state of Texas, correct?
3      A.  No, I did not.
4      Q.  Ultimately, why did you accept the Marriott
5  position?
6      A.  There were a couple of reasons that I accepted
7  the Marriott position.  One was that -- as I mentioned
8  before, we had decided to -- we were in the process of
9  building a home --
10     Q.  Uh-huh.
11     A.  -- and there was a certain time period where I
12 knew that we would need to qualify for the mortgage and
13 that I would need to have an income or we wouldn't
14 qualify for that mortgage.
15         I -- there were a few aspects about the
16 Marriott position I liked.  It was still in hospitality;
17 so I was able to, you know, transfer what I had learned
18 at Omni and from Hilton into that position.  And it was
19 a remote work-from-home position, which I had never done
20 before and thought it would be interesting to try out.
21     Q.  So you were offered the Marriott position when
22 you were still on family and medical leave, correct?
23     A.  Yes.
24     Q.  And you accepted the position when you were
25 still on family and medical leave, correct?

Page 152

1      A.  Yes.
2      Q.  Okay.  Why didn't you go ahead and go off your
3  FMLA leave at that time?
4      A.  I didn't think it -- I don't -- I didn't think
5  that one impacted the other.  I thought that -- I knew I
6  had already worked out a plan with our HR director and
7  my supervisor to return for one day, and I worked out
8  with Marriott to make sure that they were okay with me
9  fulfilling that obligation.  And I didn't -- I didn't
10 think it was going to impact anything.
11     Q.  Isn't the reason that you didn't leave Omni in
12 the middle of your family and medical leave is because
13 you wanted to get back and receive an additional
14 paycheck and your PTO prior to starting with Marriott?
15     A.  I'm sorry.  What was the question?
16     Q.  Isn't the reason why you didn't go ahead and
17 quit after you accepted your position with Marriott is
18 because you wanted to come back to Omni to receive money
19 before you left and started with Marriott?
20         MR. CAPONI:  Objection, leading.
21     Q.  (BY MS. STEELY)  You can answer.
22     A.  The reason that -- I felt like I was fulfilling
23 my obligation to Omni, and they were fulfilling their
24 obligation to me.
25     Q.  Well, you weren't going to be working there

Julia Teague vs. Omni Hotels Management Corp, et al.
Julia Teague - March 02, 2020

Page 161

1  Q.  Your response is, "I definitely need to go back
2  to work so that we don't lose the deposit on the house
3  we're building.  I've had a few opportunities come
4  along, so I'll keep you posted."  That's your response
5  to her, right?
6  A.  Yes.
7  Q.  Okay.  Well, you had already accepted a job
8  with Marriott at that time, right?
9  A.  Correct.
10 Q.  Okay.  Why didn't you just tell her, "I already
11 have accepted a job at Marriott"?
12 A.  Because I was going back to fulfill my
13 obligation to Barton Creek, and my plan was to let her
14 know after I fulfilled that obligation.
15 Q.  On Saturday, May 5th, the day after you
16 received your last pay, you tell her that you've gotten
17 a job --
18 A.  Yes.
19 Q.  -- at Marriott, right?
20 A.  Yes.
21 Q.  With regard to your position at Meritage, do
22 you have a bonus opportunity?
23 A.  At Meritage Homes?
24 Q.  Yes.
25 A.  Yes.

Page 162

1  Q.  Okay.  And what's your bonus opportunity?
2  A.  25 percent of my salary.
3  Q.  And what's your salary?
4  A.  Well, it just changed; but it has been
5  $100,000.  And then as of February 1st, 103,000.
6  Q.  Do you have health insurance?
7  A.  No, not through Meritage.
8  Q.  Do you have it through your husband?
9  A.  Yes.
10 Q.  Did you have health insurance through your
11 husband when you were at Omni?
12 A.  Yes.
13 Q.  What about life insurance?  Do you have it
14 through your husband?
15 A.  I -- I don't know.
16 Q.  I should just ask you:  Do you know if you --
17 do you have life insurance -- did you have life
18 insurance through Omni?
19 A.  I don't know.
20 Q.  Okay.  Do you know if you have it from
21 Meritage?
22 A.  I think that there are some plans where it's
23 like -- it comes -- like, a certain amount comes if
24 something were to -- I don't know.  I -- I don't know.
25 Q.  All right.  What about any type of retirement

Page 163

1  program?  Did you have retirement, 401(k), through Omni?
2  A.  I did.
3  Q.  Do you have it currently?
4  A.  Yes.
5  Q.  Did you have matching through Omni?
6  A.  Yes.
7  Q.  Do you have matching now?
8  A.  Yes.
9  Q.  Is it the same level of matching?
10 A.  I'm not positive.
11 Q.  Do you have -- did you have any kind of expense
12 account at Omni?
13 A.  An expense account?
14 Q.  Yes.
15 A.  What do you mean?
16 Q.  I'm going to pass that.
17     Did you have an automobile?  Did they give
18 you an automobile allowance --
19 A.  At Omni?
20 Q.  -- at Omni?
21 A.  No.
22 Q.  Okay.  Do you have it now?
23 A.  I do.
24 Q.  Okay.  How much is it?
25 A.  It's either 700 or 750 a month.

Page 164

1  Q.  Are you happy with your current job?
2  A.  Yes.
3  Q.  Do you believe that you will stay in this
4  position?  Are you -- I mean -- strike that.
5     Are you currently looking for another job?
6  A.  I'm not currently looking for another job.
7  Q.  So I'm going to go back to our timeline a bit
8  with the -- with the RIF.
9     So you had gotten notification on the
10 29th --
11 A.  Official notification --
12 Q.  -- official notification.
13 A.  -- yes.
14 Q.  You went through the -- to the additional
15 meetings.
16 A.  Uh-huh.
17 Q.  And then you had some medical issue with regard
18 to your pregnancy; is that correct?
19 A.  That's correct.
20 Q.  And what did you have, then, at that point?
21 A.  I had high blood pressure the next morning at
22 my regularly scheduled doctor's appointment.
23 Q.  So the 30th, you had a doctor's appointment and
24 you had high blood pressure.
25     Had you had hypertension in previous

Julia Teague vs. Omni Hotels Management Corp, et al.
Julia Teague - March 02, 2020

Page 165

1  pregnancies?
2      A.  Yes, I did.
3      Q.  Okay.  Were you on bedrest in previous
4  pregnancies?
5      A.  Yes.
6      Q.  And in your previous pregnancy, how long were
7  on you bedrest?
8      A.  I think it was for a weekend.
9      Q.  Did the doctor, on January 30th, put you on
10 bedrest?
11     A.  Yes.
12     Q.  Did you -- and you -- did you begin your FMLA
13 leave at that time?
14     A.  I did.
15     Q.  Okay.  Do you contend that the spike in blood
16 pressure was the result of your work?
17     A.  I don't know conclusively.  I'm not a medical
18 doctor.
19     Q.  Uh-huh.
20     A.  I guess that's my answer.
21     Q.  Okay.  Are you contending anything in this
22 lawsuit as a result of the high blood pressure?  Are you
23 seeking any type of damages?
24     A.  I believe that finding out that your position
25 is being eliminated or terminated -- it was a very

Page 166

1  stressful event, and it's my understanding that can lead
2  to high blood pressure in a pregnancy.
3      Q.  Okay.  Are you seeking any monetary damages as
4  a result of that in this lawsuit?
5      A.  Yes.
6      Q.  All right.
7          (Exhibit No. 16 marked)
8      Q.  (BY MS. STEELY)  All right.  I'm going to hand
9  you what's been marked as Exhibit No. 16.
10         MS. STEELY:  Here's 16.
11     Q.  (BY MS. STEELY)  So Exhibit No. 16 is Omni 211
12 through 213, with a doctor's note -- I'm not sure about
13 these two together, but I have them together -- from
14 December of 2015.
15         When was your daughter -- your first
16 daughter born?
17     A.  December 20th.
18     Q.  Okay.  And so a couple of days before your
19 daughter was born, you were put on bedrest due to
20 complications.  Is that the doctor's note, on Omni 211?
21     A.  Yes.
22     Q.  Okay.  So does 212 and 213 go with this?
23     A.  Go with it?
24     Q.  I mean, is there anything having to do with
25 your pregnancy, for 212 and 213?  I'm just trying to see

Page 167

1  why they're attached.  It's regard to your sick days.  I
2  don't think so.
3      A.  So I sent that --
4      Q.  Yeah.  I don't -- I think that someone just
5  attached that, and it shouldn't have been there.  Right?
6      A.  I don't know.
7      Q.  I don't know.  It's looks pretty --
8      A.  I'm trying to figure it out.
9      Q.  Trying to figure out that yourself, huh?  I
10 know.  Just -- let's just ignore it and let's just --
11     A.  Okay.  Yeah.
12     Q.  -- talk 211.
13     A.  I don't think it goes together.
14     Q.  How about that?  Yeah.
15         Okay.  Go through a couple of these here.
16         (Exhibit No. 17 marked)
17     Q.  (BY MS. STEELY)  All right.  So I'll hand you
18 Exhibit No. 17.  Sorry.  This is the notice from your --
19 this is the email -- well, what's Exhibit No. 17?  Oh.
20 Yeah, 17.
21     A.  It's -- looks like my note to HR and my
22 supervisor and David, letting them know about the bad
23 news I had received at my doctor's appointment and that
24 I was being put on bedrest.
25     Q.  Okay.

Page 168

1          (Exhibit No. 18 marked)
2      Q.  (BY MS. STEELY)  Okay.  I'm going to show you
3  what's been marked as Exhibit No. 18.  Exhibit No. 18 is
4  marked Teague 347 to 348.  Do you see this information?
5      A.  Yes.
6      Q.  And it looks like it's signed off by your
7  doctor on February 9th, 2018.  Is that right?
8      A.  Yes.
9      Q.  So did you fill out Teague 347 to 348, or did
10 the doctor's office?
11     A.  It looks like I filled out part of it, and part
12 of it somebody else did.  That doesn't look like my
13 handwriting.
14     Q.  So any other documentation that we would need
15 to get with regard to the information that your
16 physician filled out or had regarding your
17 pregnancy-induced hypertension, we'd have to get from
18 the doctor's office, correct?
19     A.  Beyond what I've provided?
20     Q.  Yes.
21     A.  Yes.
22     Q.  Okay.  Were you -- you're claiming damages
23 based on pregnancy-induced hypertension from Omni,
24 right?
25     A.  Like I said, I'm not a medical doctor --

Julia Teague vs. Omni Hotels Management Corp, et al.
Julia Teague - March 02, 2020

Page 197

1  with her, did you?
2   A.  I got along with Marie.
3   Q.  Okay.
4   A.  She even sent me flowers, actually, after I won
5  my Director of Marketing of the Year award.
6   Q.  In 2014, correct?
7   A.  '15.
8   Q.  '15.
9       And so as far as her being your
10 supervisor, you saw no issue with her being your
11 supervisor; is that correct?
12  A.  I saw no issue with Marie being my supervisor?
13  Q.  Yes.
14  A.  No.
15  Q.  Did you have discussions with anyone about
16 having issues with her being your supervisor?
17  A.  No.
18  Q.  So you go forward and you --
19  A.  Other than Alayna telling me, "You don't want
20 to report to her."
21  Q.  Okay.  That's what you said she had said during
22 that happy hour, correct?
23  A.  Yes.
24  Q.  After this June 15th email, do you recall
25 telling anyone that the company -- telling anyone in a

Page 198

1  roundabout -- or telling someone that the company would
2  regret it if they didn't hire you for this position?
3   A.  No.
4   Q.  So now I want to move forward a little bit and
5  talk about the application process.  You interviewed
6  with Ms. Smith in July; is that right?
7   A.  Yes.
8   Q.  Okay.  And where did you interview with her?
9   A.  Barton Creek.
10  Q.  Tell me about the meeting you had with
11 Ms. Smith in July of 2018.
12  A.  Is there anything specific you want to know?
13  Q.  Just tell me what you recall from the
14 conversation.
15  A.  I recall that she told me that somebody high up
16 at corporate was pulling the strings on this -- on this
17 position.  She didn't name who it was, but that's what
18 she said.  I think we -- she spent a lot of time, kind
19 of, talking about the situation with David.  She asked
20 me a little bit about what I had done at Marriott and
21 what I was doing there.
22      I remember asking her if everyone was
23 aware that I was interested in the position; and she
24 said, yes, that everyone at corporate and, you know, on
25 property was aware -- or not everyone on property, but

Page 199

1  that the pertinent people on property were aware.
2       I remember her saying that she had
3  received other resumes that seemed interesting.
4   Q.  Uh-huh.
5   A.  And then I remember asking if she wanted to see
6  me back in the role.  And she said, "I thought we worked
7  well together, and my commitment to you is that I would
8  recommend you for the next round."
9   Q.  Okay.  And what did you understand the next
10 round was going to be?
11  A.  I didn't know.  And I think I asked about it,
12 and she didn't seem to know either.  She just said --
13 oh, I think I said, you know, what the next steps were;
14 and she said she wasn't sure.  And I said -- she thought
15 it would be some -- talking with someone at corporate.
16      And I said, "Do you know about, like, the
17 timing of when you're looking to hire the position?"
18      And she said, "Two weeks ago."
19  Q.  Okay.  So she really couldn't give you a
20 timeline of when the position was going to be hired at
21 that point, right?
22  A.  She indicated to me that she would like someone
23 to start right away when she said, "Two weeks ago."
24  Q.  But you also understood that it was really not
25 in her hands when somebody was going to start, correct?

Page 200

1   A.  I did not know that.
2   Q.  Well, she told you that somebody else at
3  corporate was pulling the strings, right?
4   A.  She told me somebody was pulling the strings on
5  the position, yes.
6   Q.  Okay.  At some point she also told you that the
7  position was out of her hands, right?  That it changed?
8   A.  Like --
9   Q.  The reporting structure?
10  A.  Oh, yes, yes, yes, she did.
11  Q.  And I'm sorry that -- yeah.
12  A.  She said that -- she said that the reporting --
13 actually, I don't know -- I'm trying to remember of -- I
14 think that might have been in a text message.
15  Q.  Okay.  If you look back at the text, if you go
16 to -- if you go to 265 --
17  A.  Yes.
18  Q.  -- it says -- from Ms. Smith to you, on
19 August 1st, "Just to fill you in further, Marketing has
20 pulled out of my direct report.  I [sic] will now report
21 directly to the GM."
22  A.  Yes.
23  Q.  "I'm still responsible for marketing at resort,
24 however there is no reporting structure so I am
25 completely out of the interview process."

Case 1:19-cv-00940-ADA Document 39-1 Filed 09/21/20 Page 10 of 11

Page 51 (Pages 201-204)

Julia Teague vs. Omni Hotels Management Corp, et al.
Julia Teague - March 02, 2020

Page 201

1  And it says, "They are looking at it like
2 the DOM will be a third-party agent that provides a
3 service to me. In other words, all the responsibility
4 but no authority."
5  And she then states she has forwarded your
6 app -- forwarded all the applications to Alayna and
7 Caryn, right?
8  A. Correct.
9  Q. So you understand at this point, on August 1st,
10 the position is now going to be a peer position to
11 Carissa Smith?
12  A. I don't know that I understood it as a peer
13 position, just exactly how -- what she said.
14  Q. If you go to 266, which is the next page --
15  A. Uh-huh.
16  Q. -- you ask her, "And you" -- "with you still
17 being responsible for resort marketing, it really
18 surprises me that you wouldn't continue to be involved
19 in the interview process and ultimately the hiring
20 decision."
21  A. Uh-huh. Yes.
22  Q. She responds, "Yes. But because they are a
23 peer, I will only be involved as a courtesy meet and
24 greet." Do you see that?
25  A. Yes.

Page 202

1  Q. All right. Then if you go to the last page --
2 just go ahead to the last page of this deposition
3 exhibit and we'll get this deposition exhibit done.
4  If you go to Teague 268, the very last
5 page, on November 26th, she -- Ms. Smith texts you to
6 let you know that Stephanie Baker has been hired. Do
7 you see that?
8  A. Yes.
9  Q. All right. Did you know, prior to November 26,
10 that Stephanie Baker had been hired for the position?
11  A. No.
12  Q. So that's the first that you --
13  A. I knew that -- I knew that they had extended
14 the offer to someone else. I didn't know who it was.
15  Q. Okay.
16  (Exhibit No. 24 marked)
17  Q. (BY MS. STEELY) I'm going to hand you what's
18 been marked as Exhibit No. 24.
19  Is this the new director of marketing
20 position that you applied for in the summer of 2008?
21  A. Yes, it looks to be so.
22  Q. Okay. And this, again, is Teague 12. And
23 where did you obtain a copy of this -- of the new
24 director of marketing position?
25  A. Where did I obtain a copy of it?

Page 203

1  Q. Yes.
2  A. The website.
3  Q. Okay. After Ms. Oram said, "Hey, listen, I'm
4 out of the -- the interview process" --
5  A. Ms. Smith said that.
6  Q. -- oh, Ms. Smith said that --
7  A. Uh-huh.
8  Q. -- what did you do next with regard to seeking
9 employment with Omni?
10  A. After Ms. Smith said she's out of the hiring
11 process?
12  Q. Yes.
13  A. I think I followed up with her. I can look at
14 it and see. I think I followed up with her. Actually,
15 I think it was emails that I followed up with her to see
16 if I was still in consideration because I hadn't heard
17 anything in a while. And then -- and then a corporate
18 recruiter reached out to me to arrange a brief chat.
19  Q. Okay. And who was the corporate recruiter?
20  A. Chris -- I'm not sure exactly how to say his
21 name. Brychell or Brychell.
22  Q. Brychell. And what -- do you recall the time
23 period that you spoke to Chris?
24  A. I believe it was in September.
25  Q. Okay. Tell me what all you can recall about

Page 204

1 your conversation with Chris Brychell about the director
2 of marketing position.
3  A. I thought we had a really great call. He had
4 worked for Starwood and Marriott, and we knew some of
5 the same people there. So we -- I remember him asking
6 me if I had worked with so-and-so or so-and-so. And
7 then we talked about -- he kind of started off with, you
8 know, Barton Creek is going through a major renovation.
9  Q. Uh-huh.
10  A. And he talked about what they were looking for
11 in this director of marketing role. He said that the
12 position would report in to the general manager, and I
13 believe -- I thought he said it would sit on the
14 executive committee.
15  And then we talked about -- I think he
16 asked me, kind of, some ideas of -- or, you know, where
17 I thought the marketing should go for the resort, that
18 type of thing.
19  Q. Uh-huh. And after you had this interview, I
20 know you -- you had a couple of follow-ups, texts to him
21 or emails to him --
22  A. Emails, uh-huh.
23  Q. -- trying to understand the position. Did you
24 talk to him again after that, other than the emails?
25  A. I don't think we ever spoke again.

Case 1:19-cv-00940-ADA   Document 39-1   Filed 09/21/20   Page 11 of 11
Page 68 (Pages 269-272)
Julia Teague vs. Omni Hotels Management Corp, et al.
Julia Teague - March 02, 2020

## Page 269

```
 1     UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF TEXAS
 2            AUSTIN DIVISION
 3   JULIA TEAGUE,        )
                          )
 4      Plaintiff,        )    C.A. NO.
                          )
 5   VS.                  )    1:19-cv-940
                          )
 6   OMNI HOTELS MANAGEMENT)
     CORPORATION, and     )    Jury Trial Demanded
 7   TRT HOLDINGS, INC.   )
                          )
 8      Defendant.        )
 9
10      ****************************************
11            REPORTER'S CERTIFICATION
12       ORAL AND VIDEOTAPED DEPOSITION OF
13                JULIA TEAGUE
14               MARCH 2, 2020
15      ****************************************
16
17      I, Katherine A. Buchhorn, Certified Shorthand
     Reporter in and for the State of Texas, hereby certify
18   to the following:
19      That the witness, JULIA TEAGUE, was duly sworn by
     the officer and that the transcript of the oral
20   deposition is a true record of the testimony given by
     the witness;
21
        That a copy of this certificate was served on all
22   parties and/or the witness shown herein on
     March 14, 2020.
23
24            *-*-*-*
25            *-*-*-*
```

## Page 270

```
 1      I further certify that pursuant to FRCP Rule
     30(f)(1) that the signature of the deponent:
 2
        ___ was requested by the deponent or a party before
 3   the completion of the deposition and that the signature
     is to be before any notary public and returned within
 4   30 days from date of receipt of the transcript.  If
     returned, the attached Changes and Signature Page
 5   contains any changes and the reasons therefore.
        ____ was not requested by the deponent or a party
 6   before the completion of the deposition.
 7      I further certify that I am neither counsel for,
     related to, nor employed by any of the parties or
 8   attorneys in the action in which this proceeding was
     taken, and further that I am not financially or
 9   otherwise interested in the outcome of the action.
10      Certified to by me this 14th day of March, 2020.
11
12
13      _____Katherine A. Buchhorn_____
          KATHERINE A. BUCHHORN, CSR No. 2788
14        Expiration Date: 07/31/22
          Firm No. CRF-13055
15        P.O. Box 6749
          Round Rock, Texas 78683
16        (512) 574-2455
17
18
19
20
21
22
23
24
25  Job No. 030220.Teague
```

## Page 271

```
 1            CHANGES AND SIGNATURE
 2        WITNESS NAME:  JULIA TEAGUE
          DATE OF DEPOSITION:  MARCH 2, 2020
 3
        Reason Codes:  (1) to clarify the record; (2) to conform
 4   to the facts; (3) to correct a transcription error;
        (4) other (please explain).
 5
      PAGE  LINE                REASON CODE
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

## Page 272

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2
 3      I, JULIA TEAGUE , do hereby certify that I have read
 4   the foregoing pages and that the same is a correct
 5   transcription of the answers given by me to the
 6   questions therein propounded, except for the corrections
 7   or changes in form or substance, if any, noted on the
 8   attached errata page.
 9
10      _____
         JULIA TEAGUE             DATE
11
12
13  ___ No Changes Made  ___ Errata Sheet(s) Attached
14
15
16  JULIA TEAGUE, Plaintiff
         v.
17  OMNI HOTELS MANAGEMENT CORPORATION, and
    TRT HOLDINGS, INC., Defendant
18
19
20
21
22
23
24
25  Job No. 030220.Teague
```