UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JULIA TEAGUE, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:19-cv-00940 |
| | § | |
| OMNI HOTELS MANAGEMENT | § | |
| CORPORATION, and | § | |
| TRT HOLDINGS, INC., | § | |
| Defendant. | | |

**<u>PLAINTIFF'S RESPONSE TO OMNI HOTELS MANAGEMENT CORPORATION'S
MOTION FOR SUMMARY JUDGMENT</u>**

## I. INTRODUCTION

Defendant Omni Hotels Management Corporation ("Omni") and TRT Holdings, Inc. ("TRT") fired their award-winning, top-performing Director of Marketing of six years just days before she gave birth.  They retained all her non-pregnant peers, distributed her duties to non-pregnant employees, and then replaced her with an unqualified non-pregnant newcomer with no hotel experience.  Plaintiff asserts pregnancy discrimination and FMLA claims.

## II. STATEMENT OF FACTS

In April 2012, Plaintiff Julia Teague was hired as Director of Marketing Communications and as an Executive Committee ("EC") member at Barton Creek Resort & Spa (the "Resort").[1] Around July 2013, Omni acquired the Resort and changed Plaintiff's title to Director of Marketing (DOM).[2]  Omni made Teague an "Extended" EC member.[3]  The EC includes the property's top leadership who collaborate to make high-level decisions that impact the guest/member experience, the associate experience, and the overall business results.[4]  Plaintiff attended EC meetings, she was included on the EC email distribution list, she participated in the EC annual retreat, and she was generally regarded as an EC member on property.[5]  All EC and Extended EC members reported either directly or indirectly to Resort Managing Director David Jurcak in January 2018.[6]

**Top Talent Before Pregnancy**

During her tenure at the Resort, Plaintiff earned outstanding performance reviews.[7]  She received merit increases each year, including in 2017.[8]  Omni named Plaintiff Omni Hotels 2014

---

[1] Ex. 26, Teague000155-56.
[2] Ex. 22, Omni 000549-553 and Omni 000160.
[3] Ex. 25, Teague Dep. 85:19-25 and 86:1-5; Oram Dep. 71:7-12.
[4] Ex. 15, Teague Dec. at ¶ 2.
[5] Ex. 22, Omni 000549-553 and Teague Dep. 87:2-4; Ex. 15, Teague Dec. at ¶ 3; Ex. 22, Omni 000236.
[6] Ex. 15, Teague Dec. at ¶ 3.
[7] Ex. 22, Omni 000121-000125, Omni 000129-000134, and Omni 000137-143.
[8] Ex. 22, Omni 000449-553.

DOM of the Year during an award ceremony in Florida in the Spring of 2015.[9] Jurcak described her as a high performer.[10] Others called her amazing[11] and brilliant.[12]

Plaintiff planned to continue her excellent work for Omni during the upcoming $150 million Resort property renovation.[13]  Jurcak testified he had confidence in Plaintiff's ability to lead marketing efforts for the renovated property, and no one from Omni ever expressed concerns to him about Plaintiff's ability to lead marketing efforts for the renovated property.[14]  Plaintiff's supervisor, Director of Sales and Marketing Carissa Smith, also wrote Plaintiff was ready for the challenge the renovation would provide her.[15]  In June 2017, Jurcak announced the likelihood of a Resort closure in an EC meeting and reassured meeting attendees, including Plaintiff, that "everyone in this room is safe."[16]

### Jurcak's Negative Comments About Plaintiff's Pregnancy

Plaintiff announced her pregnancy in August 2017 and submitted FMLA paperwork for maternity leave.[17]  Jurcak showed blatant disrespect toward Plaintiff's pregnancy multiple times. When Plaintiff was six months pregnant, Plaintiff attended a team outing with Jurcak and coworkers held at a go-kart speed racing track and declined to participate in the speed racing because of her pregnancy.[18]  Jurcak negatively questioned why Plaintiff would decline to race go-karts at six months pregnant.  Then, in early January 2018, roughly a month before she would give birth, Teague asked Jurcak about obtaining a special accommodation permit that would allow her

---

[9] Ex. 26, Teague 000044, Teague 000181 and Teague 000353-000358.
[10] Ex. 19, Jurcak Dep. 29:8-23.
[11] Ex. 26, Teague 000294.
[12] Ex. 26, Teague 000297.
[13] Ex. 15, Teague Dec. at ¶ 4; Ex. 19, Jurcak Dep. at 120:13-20.
[14] Ex. 19, Jurcak Dep. 18:19-25, 32:1-5.
[15] Ex. 22, Omni 000129-136.
[16] Ex. 19, Jurcak Dep. 46:10-25; 48:17-21; Ex. 25, Teague Dep 42:2-24 and Ex. 24, Smith Dep. 72:3-11.
[17] Ex. 22, Omni 000449-553.
[18] Ex. 25, Teague Dep. at 218:9-219:25.

to park closer to her office so she would not have to walk as far each day while pregnant.[19]  Jurcak dismissed her request, telling her "No, you're pregnant, not disabled."[20]

## Jurcak Terminates the Pregnant Plaintiff

On January 29, Jurcak told Plaintiff her employment was terminated.[21]  Jurcak had selected ***every other*** Extended EC member facing position elimination at the Resort, who did not already have an alternative position identified within the company, as "Managers we feel we need to find positions for in OH&R [Omni Hotels & Resorts]."[22]  Omni found positions for those 10 non-pregnant people, with the pregnant Plaintiff as the only manager to be separated.[23]

Jurcak and all other decision-makers knew Plaintiff was pregnant when making these decisions.[24]  Jurcak specifically flagged Plaintiff as one of "several issues"[25] he needed to discuss with HR specifically.[26]  Other Extended EC Members' jobs were saved by being assigned to task force (temporary assignment) positions, and Jurcak discussed a "Tracking Form completed for all interested in task force but not assigned,"[27] but HR Director Joy Rothschild testified she was not aware of ***any*** steps Omni took in 2018 to determine whether Plaintiff would receive a task force assignment,[28] and Omni never reached out to pregnant Plaintiff about task force opportunities.[29]  Omni contends all nonessential positions were eliminated in the RIF,[30] but Omni retained a

---

[19] Ex. 25, Teague Dep. at 242:19-243:13.
[20] *Id.*
[21] Ex. 15, Teague Dec. at ⁋ 6.
[22] Ex. 22, Omni 000504-000506, Omni 000495 and Omni 000497.
[23] Ex. 27, Corp. Rep. Dep. at 122:5-125:14 ("Q. So the only member of the Extended Executive Committee or Executive Committee to lose employment with Omni as a result of the closure was Julia Teague; correct? A. Yeah."); Jurcak Dep. 184:3-8.
[24] Ex. 19, Jurcak Dep. at 50:12.
[25] Ex. 22, Omni 000422.
[26] Ex. 25, Jurcak Dep. 87:11-14.
[27] Ex. 22, Omni 000793-95.
[28] Ex. 27, Corp. Rep. Dep. at 51:24-53:25; Rothschild confirmed Omni identified jobs and offered new positions to over 30 people on January 29, but not for Teague. Ex. 27, Corp. Rep. Dep. at 160:10-161:8.
[29] *Id.*; Ex. 15, Teague Dec. at ⁋ 14.
[30] Dkt 38 ¶ 3.

position for the non-pregnant Carissa Smith who assumed DOM duties in Plaintiff's absence, and found transfers or "task force" positions for every other affected Extended-EC member other than Plaintiff.[31]  Omni had an open resort marketing position at Omni Amelia Island Plantation Resort on January 29, but offered it to non-pregnant marketing manager Kayla Dorr, who declined it that same day.[32]  Omni never offered that open marketing position to Teague.[33]  Omni also did not follow its own standard operating procedure for Plaintiff's termination requiring it to complete a termination checklist including the termination date and whether the associate is rehire-able.[34]

Omni's corporate representative admitted Omni directly considered Plaintiff's pregnancy in deciding on the timing of her separation.[35]  Omni changed Plaintiff's termination date because of her pregnancy as in-house counsel "ultimately thought this was the best thing."[36]  By changing the date, Omni avoided paying Plaintiff severance or offering Plaintiff another job opportunity as they did for ***all other managers or associates*** terminated effective January 29.[37]  Jurcak admitted no one at Omni had any discussion with Plaintiff as to whether this change was favorable for her ("**Whether it was good for Julia or not**, it was a decision made for her …"), and admitted if Omni had not treated her differently because of pregnancy, she would have received a severance package like others who lost jobs in January.[38]  Without the date change, Plaintiff still would have received her short-term disability benefits.[39]  Yet, when asked if there were any safeguards in place

---

[31] Ex. 19, Jurcak Dep. at 184:3-8. Although Omni points out that Teague was pregnant once before, that prior pregnancy was before Jurcak became one of her supervisors.
[32] Ex. 27, Corp. Rep. Dep. at 137:3-4; Ex. 19, Jurcak Dep. at 83:6-7; Ex. 27, Corp. Rep. Dep. at 137:1-4, 142:5-10, 149:13-150:1; Ex. 25, Teague Dep. at 266:20-267:3.
[33] Ex. 26, Teague 000612.
[34] Ex. 27, Corp. Rep. Dep. at 69:4-24; Omni 107-08.
[35] Ex. 27, Corp. Rep. Dep. at 30:11-22 ("Q. So Omni considered pregnancy in selecting the date of her termination; correct? A. Yes.")
[36] Ex. 27, Corp. Rep. Dep. at 35:1-21.
[37] Ex. 19, Jurcak Dep. 176:4-17.
[38] Ex. 19, Jurcak Dep. at 173:20-175:10 (emphasis added), 176:4-25.
[39] *See* Ex. 15, Teague Dec. at ¶ 9; Ex. 26, Teague 000380-83, Teague 000359-64; Ex. 3, Disability Benefits FAQ.

to ensure Jurcak did not consider Plaintiff's pregnancy in his decision-making, Rothschild said that "wouldn't cross my mind."[40]

## Omni Covers-Up Smith's Involvement

Omni denies Smith was a decision-maker in the RIF, but she discussed impacted positions with Jurcak prior to the January 29 announcement,[41] and authored a spreadsheet at least a week before the announcement providing RIF recommendations on everyone in sales and marketing in some way except the pregnant DOM.[42]  Smith never tried to find open positions for pregnant Plaintiff, but she tried to find an open position for a non-pregnant employee.[43]  Two other corporate marketing positions opened in April 2018, before Plaintiff's employment technically ended, but no one offered those to Plaintiff or even informed her about them.[44]  One other reason a jury may believe Omni is hiding Smith's involvement is that Smith told Plaintiff on the day she was notified of her termination, "well, now you'll have more time with your baby."[45]

## Omni Discourages then Refuses to Seriously Consider Plaintiff for the DOM Role

On June 1, only a month after Plaintiff's technical last day on April 30, Smith sought and received permission to repost and hire the DOM position, which posted on June 6.[46]  This was the same title and essential functions as Plaintiff's DOM role.[47]  The job description Plaintiff's replacement ultimately signed[48] is the same as Plaintiff's job description.[49]  Plaintiff met all the

---

[40] Ex. 37, Corp. Rep. Dep. at 131:6-21.
[41] Ex. 24, Smith Dep. 12:5-13:25.
[42] Ex. 15, Teague Dec. at ₱ 5; Ex. 22, Omni 000598.
[43] Ex. 24, Smith Dep. 23:3-17.
[44] Ex. 26, Teague 001136-37.
[45] Ex. 25, Teague Dep. at 224:8-10, 254:3-23.
[46] Ex. 24, Smith Dep. 26:2-11.
[47] What Omni now calls the "EC-level DOM" role, *see* Dkt 38 ¶ 9, is simply the same DOM role Plaintiff performed, with same duties and responsibilities.
[48] Ex. 22, Omni 000557-58.
[49] Ex. 22, Omni 000757-63.

requirements for the "new" role, with six years of marketing director experience at the Resort, plus four years of prior director-level and VP-level experience.[50]  Plaintiff hoped to return, since Jurcak earlier told her he could not imagine any other candidate would be more qualified than her to fill the reopened position.[51]

Smith nonetheless attempted to discourage Plaintiff from applying by untruthfully claiming the role was very different.[52]  She told Plaintiff "the biggest difference is the split responsibility to [Golf] Club and Resort."[53]  Smith originally red-lined the DOM job description Plaintiff submitted to add only one more qualification: "Experience working with a membership base or similar structure is preferred."[54]  But, Teague met this—she was already supporting the Golf Club and its membership base since 2017, which Smith acknowledged in Plaintiff's 2017 annual review.[55]

Corporate Marketing Director Alayna Oram, after meeting with Smith, strongly discouraged Plaintiff from pursuing the DOM role.[56]  By this time, Smith had already told Oram she did not think Plaintiff would be a "good fit."[57]  After Plaintiff applied, Smith said she intentionally stalled Plaintiff for a month before interviewing her for the role.[58]  Oram said she

---

[50] Ex. 22, Omni 000184.
[51] Ex. 15, Teague Dec. at ¶ 7.
[52] Ex. 22, Omni 000507-509.
[53] Ex. 22, Omni 000517.
[54] Ex. 22, Omni 000594-95.
[55] Ex. 22, Omni 000121-25. In 2017 alone, Teague did the following to support the golf club: developed an "Around the Club" and "State of the Club" newsletters to communicate updates to members; budgeted for club renovation marketing efforts; planned photo and video shoots for the renovated clubhouse and other facilities; developed menus for the new clubhouse; developed fence wrap for the country club and clubhouse; discussed enhancements for club website; and promoted shared club and resort events (e.g., Barton Creek LIVE). Ex.25, Teague Dep. at 101:9-102:13. Jurcak admitted Plaintiff worked on member communications and club marketing materials. Ex. 19, Jurcak Dep. 41:19-43:5; 140:11-144:8; Ex. 26, Teague 000152, 000178, 00226-30. At the time of her departure, Teague was leading an initiative to enhance the Club website and was working on promotional videos to showcase the property renovation to future resort guests and country club members/prospects.  And throughout her six-year tenure at Barton Creek, Plaintiff promoted the four golf courses shared by both resort guests and club members. See Ex. 26, Teague 000023-25, 000054-56, 000178, 000253-254, 000281, 000285, 000311-12.
[56] Ex. 25, Teague Dep. 176:1-177:4.
[57] Ex. 23, Oram Dep. 32:24- 35:3.
[58] Ex. 22, Omni 000223-24.

hoped corporate HR eliminated Plaintiff's official application.[59]   As early as July 13, Omni's documentation shows Plaintiff is not listed as a candidate for the DOM role.[60]   Although Oram interviewed the candidates that Omni took seriously, Teague's application was never sent to her.[61] Omni provided conflicting testimony on whether it ever granted Plaintiff an official interview for DOM.[62]  Internal recruiter Chris Brychell, wondering whether there is a "scenario where [Teague] would be considered," admits there is "more to the story—all that occurred before I started."[63]

Omni's testimony conflicts as to whether Smith was involved in the selection process: Smith swore she was removed from the process while Omni's Corporate Representative swore Smith's input was considered in selecting the finalists, and Smith's own emails show on August 31 she recommended Omni advance someone else, Stephanie Baker.[64] Smith's involvement in selecting the a replacement DOM is a key question in this case with conflicting sworn testimony.

**Omni's Replacement Did Not Meet Qualifications**

Omni actually had to lower the job requirements during the hiring process to try to find a qualified candidate other than Plaintiff.[65]   Omni's finalists failed to even meet the lowered criteria.[66]

---

[59] *Id*.
[60] Ex. 22, Omni 000323-25.
[61] Ex. 22, Omni 000229.
[62] *Compare* Ex. 23, Oram Dep. 44:1-7 and Ex. 24, Smith Dep. 127:15-16.
[63] Ex. 22, Omni 335.
[64] Ex. 22, Omni 000265; *Compare* Ex. 24, Smith Dep. 48:4-8 *and* Ex. 27, Corp. Rep. Dep. at 77:10-21; 84:9-12. ("Alayna and Carissa were really the key inputs into who Todd was going to interview, and Todd was not introduced to Julia as a candidate").
[65] Ex. 14, Redline Job Description, Omni000237; Ex. 22, Omni 000225, 000377-378.
[66] For example, according to her resume, finalist Shaady Ghadessy had less than one year of director level experience at that time, compared to non-finalist Teague who just spent the prior six years as the award-winning Director of Marketing at that very place. Ex. 22, Omni000175.

Omni replaced Teague with Stephanie Baker, stating publicly that "when the job was re-opened, Ms. Teague was replaced…"[67]  Baker sat on the Extended EC, just as Plaintiff had.[68]  Baker lasted only about 5 months.[69]  She left saying Omni was *not* family friendly, she did not like the hours, and felt they were too demanding,[70] as Smith admitted.[71]  "Better work/life balance" is cited as the reason for Baker's departure.[72]  The DOM today again reports to Smith.[73]  When the position was again open in 2019, Omni never notified Plaintiff about it.[74]

### III.    STANDARD OF REVIEW

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.  The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the nonmoving party must use affidavits, depositions, answers to interrogatories, and admissions to designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324; see also FED R. CIV. P. 56(e).  In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the

---

[67] Ex. 26, Teague 001180.
[68] Ex. 22, Omni 000449-553, Omni 000569-73.
[69] Ex. 24, Smith Dep. 63:18-19.
[70] Ex. 37, Corp. Rep. Dep. at 119:12-120:1.
[71] Ex. 24, Smith Dep. 67:18-25 ("It was more of needing to come in later or drop kids off or needing to leave by five … she had shared with me that her GM, our GM, Mr. Raessler, was not as flexible as she was used to on the ability to be able to leave and come and go.");  Smith Dep. 67:4-8. Smith also testified, "…someone is always at the resort working 24 hours a day, and things come up regardless of the time of day …as managers in the hospitality business, you understand that you're there where and when needed.")
[72] Ex. 22, Omni 000250.
[73] Ex. 24, Smith Dep. 65: 6-13.
[74] Ex. 24, Smith Dep. 65:6-66:5.

nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## IV.    ARGUMENT

### A.    Pregnancy Discrimination

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  As amended by the Pregnancy Discrimination Act ("PDA"), Title VII defines the term "because of sex" as including, but not limited to, "because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).  A claim brought under the PDA is analyzed like any other Title VII discrimination claim.  *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998).  A plaintiff may prove discrimination by direct or circumstantial evidence.  *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2007).  When the plaintiff offers circumstantial evidence, the *McDonnell-Douglas* framework requires the plaintiff to establish a *prima facie* case of discrimination, which, when done, shifts the burden to defendant to articulate a legitimate non-discriminatory reason for the adverse employment action.  *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

### 1.    Prima Facie Case

To state a *prima facie* case of pregnancy discrimination, Plaintiff must show that (1) she was a member of a protected class, (2) she was qualified for the position, (3) she suffered an

adverse employment action, and (4) she was replaced by an employee who was not in the protected class. *Laxton v. Gap*, 333 F.3d at 578.[75]

Defendants do not contest the first three elements.[76] For the fourth element, replacement not in the protected class, Plaintiff need only demonstrate her duties were delegated to non-pregnant employees. *See McLaughlin v. W & T Offshore, Inc.*, 78 F. App'x 334, 337-338 (5th Cir. 2003) (employee established *prima facie* case by demonstrating she was discharged following her return from maternity leave and that her duties were delegated to two non-pregnant employees). Defendants first reassigned Teague's duties to her non-pregnant supervisor, Carissa Smith.[77] Then, Defendants assigned her duties to the non-pregnant replacement employee Stephanie Baker.

The Fifth Circuit has held that temporal proximity of less than four months between an employee's protected activity and an adverse employment action, standing alone, can satisfy the causation element of the *prima facie* case. *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).[78] This element "may also be satisfied when the plaintiff relies upon a chronology of events from which retaliation may plausibly be inferred." *Mooney v.*

---

[75] Defendants assert a different prima facie case: that (1) she is a member of a protected group, (2) she was adversely affected by the employer's decision, (3) she was qualified to assume another position at the time of the discharge, and (4) there is sufficient evidence from which a fact finder may reasonably conclude that the employer intended to discriminate in reaching the adverse employment action. Dkt. 38 at ¶ 15 (*citing Howard v. Edgewood Indep. Sch. Dist.*, No. 5-16-cv-00962, 2019 WL 570776, at *14-15 (W.D. Tex. Feb. 11, 2019) (citations omitted) (*citing Meinecke v. H&R Block of Houston*, 66 F.3d 77, 83-84 (5th Cir. 1995))). However, the *Meinecke* case uses the *prima facie* standard as cited by Plaintiff, modifying the fourth element in a reduction-in-force case that people outside the protected classes remained in similar positions. *Meinecke*, 66 F.3d at 83-84.

[76] *See* Dkt. 38 at ¶¶ 15-18. Defendants contest that Plaintiff was in the protected class during the rehire, but the rehire is simply a continuing part of the discrimination, and even if it were not there is no question that during the rehire time period Plaintiff had the childcare responsibilities of a new mother and had recently taken FMLA leave, and that the decision-makers knew this.

[77] Ex. 24, Smith Dep. 58:17-59:22. Smith assumed several projects Plaintiff had been leading. *See* Ex. 26, Teague 000253-000254, Teague000250-000251, Teague000245-000246, Teague000240; Ex. 22, Omni 000379.

[78] *See also Starnes v. Wallace*, 849 F.3d 627, 635 (5th Cir. 2017) ( "[W]hen it comes to timing, we have recognized that the *prima facie* case does not rigidly consider only one form of temporal connection.") (reversing summary judgment despite the lapse of one year between the protected activity and termination because the employer felt the brunt of the consequences of the protected activity just two months prior to the termination).

*Lafayette Cty. Sch. Dist.,* 538 F. App'x 447, 454 (5th Cir. 2013).  Here, Plaintiff was pregnant, requested FMLA leave, and was about to give birth and go on leave when Omni decided to terminate her employment while retaining or re-assigned her non-pregnant peers.[79]  That alone is enough to satisfy the low burden of the *prima facie* case.

Defendants wrongly contend Plaintiff must show that other employees outside the protected class remained in similar positions.[80]  Even if that were required, Plaintiff meets it because Jurcak testified that the pregnant Plaintiff was the *only* member of the Extended EC, all of whom were not pregnant and reported to Jurcak directly or indirectly, who lost employment with Omni as a result of the closure.[81]  Defendants also wrongly contend Plaintiff must prove there was an open similar position available she was qualified to assume at the time of her discharge, but even if that were required, she met it: she identified a vacant marketing manager position she was qualified to assume that Defendants did not offer her.[82]

---

[79] Ex. 19, Jurcak Dep. at 110:21-111:3.

[80] Dkt. 38 at ¶ 18 (*citing Meinecke*, 66 F.3d at 83-84). The standard for the final element of the *prima facie* case is not as inflexible as Defendants suggest.  Courts regularly find plaintiffs meet the *prima facie* case standard with facts that suggest pretext and that pregnancy may have been a factor in the decision.  *See Starnes v. Wallace*, 849 F.3d 627 (5th Cir. 2017) (rejecting a mechanical application of *McDonnell Douglas* and finding pretext evidence is relevant at the *prima facie* case stage)*; Gerdin v. Ceva Freight, LLC,* 908 F. Supp. 2d 821, 827-28 (S.D. Tex. 2012) *(citing McLaughlin v. W & T Offshore, Inc*., 78 Fed. App'x. 334, 338 (5th Cir. 2003) (*per curiam*) (*prima facie* case established by showing that plaintiff was pregnant, discharged following return from maternity leave, and her duties were delegated to two nonpregnant employees)).  A separate, rigid analysis is not required for this element.

[81] Ex. 19, Jurcak Dep. at 184:3-8; *See* Ex. 25, Teague Dep. at 198:4-7; Ex. 24, Smith Dep. at 118:6-22; Ex. 23, Oram Dep. at 43:7-12.

[82] *See* Ex. 18, Open Positions Spreadsheet; Ex. 27, Corp. Rep. Dep. at 137:1-4. Defendants suggest Plaintiff must show there was an open position with the exact title "Director of Marketing" to establish the *prima facie* case. Dkt. 38 at ¶ 16. This is not the standard and none of Defendants' cases go so far. This argument is particularly inapplicable here, where Defendants contend the reopened Director of Marketing position (same title) is still not the same position. Further, several Resort managers were promoted into elevated positions: Antonio Sanchez was offered a promotion from a housekeeping role to a Director of Rooms at Omni Corpus Christi, and Tiffany Delacruz in front office was elevated to Director of Rooms. Ex. 15, Teague. Dec. at ¶ 15. *See* Ex. 25, Teague Depo 1 at 68:11-70:16. Defendants contend "Plaintiff admits that that the Resort did not have an open position similar to hers at the time." This misstate Plaintiff's testimony: Plaintiff testified only that she did not know of another vacant *DOM* position (her exact title) *within Texas* at the time of the closure, but did not foreclose the existence of open similar marketing positions she was qualified to assume.

## 2.      Legitimate Non-Discriminatory Reason

It is Defendant's burden under *McDonnell-Douglas* to articulate a legitimate non-discriminatory reason for the employee's termination with "sufficient clarity" to allow the employee to show pretext. *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004).  This requires a showing not just that there was a RIF, but that there was a nondiscriminatory reason why the plaintiff was selected for it. *See Diaz v. Eagle Produce L.P.*, 521 F.3d 1201, 1211 (9th Cir. 2008) ("[A]n employer's explanation must explain why the plaintiff 'in particular' was laid off.").  In this case, Defendants state "[h]er position was eliminated because Omni considered her job functions to be nonessential during the one-year closure."[83]  That is factually untrue: Omni reopened the job within two months of Plaintiff's last day and hired her replacement to do those functions within six months (not one year) of eliminating the position.[84]

## 3.      Pretext

At this stage of the *McDonnell-Douglas* analysis, the burden shifts to Plaintiff to demonstrate that Defendants' proffered reasons are pretext and their treatment of Plaintiff was based, at least on part, on her pregnancy.  A plaintiff can show pretext by showing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's reason. *U.S. ex rel. Sharp v. Eastern Okla. Orthopedic Ctr.*, 2013 U.S. Dist. LEXIS 154646, at *44-45 (N.D. Okla. Oct. 29, 2013) (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013)); *see also Kakeh v. United Planning Org., Inc.*, 536 F. Supp. 2d 65, 74 (Dist. D.C. February 27, 2008) (mem. op.) (denying summary judgment due in part to "inconsistencies between Defendant's explanation that Plaintiff's termination was a result of the reduction-in-force and other evidence in the

---

[83] Dkt. 38 at ℙ 19.
[84] Ex. 16, Teague Smith Job Posting Texts; Ex. 14, Redline Job Description.

record.").[85]  Evidence of pretext may take a variety of forms, and courts can combine multiple independently insufficient pretextual facts to find pretext sufficient to deny summary judgment. *Laxton*, 333 F.3d at 583; *see also Bosque v. Starr Cnty., Tex.*, 630 F. App'x 300, 304–05 (5th Cir. 2015) (explaining that attempting to cabin pretext evidence is contrary to precedent and commonsense).  Here there are at least seven separate pieces of pretextual evidence that create fact issues as to whether Defendants were motivated by pregnancy (and/or FMLA).

### a.  Concurrent Temporal Proximity

A short temporal proximity can constitute evidence of pretext for summary judgment purposes.  *See Richard v. Cingular Wireless LLC*, 233 Fed. App'x 334, 338 (5th Cir. 2007) (two and a half month span allows for inference of causation); *Rikabi v. Nicholson*, 262 Fed. App'x. 608, 611-612 (5th Cir. 2007) (three months establishes pretext). Certainly, "[t]he combination of suspicious timing with other significant evidence of pretext[] can be sufficient to survive summary judgment." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 2019).[86]

Plaintiff was pregnant when Defendants decided to fire her, was about to go on maternity leave when they told her, and her last day was her first day back from pregnancy leave.[87]  There is no closer temporal proximity possible—the pregnancy and illegal decision are concurrent.

---

[85] Like any other termination, a RIF cannot be used as pretext to discriminate. *See, e.g.*, *Matthews v. Commonwealth Edison*, 128 F.3d 1194, 1195 (7th Cir. 1997) ("Even if the employer has a compelling reason wholly unrelated to the [protected class] of any of its employees to reduce the size of its work force, this does not entitle it to use the occasion as a convenient opportunity to get rid of [the protected class of] workers") (internal quotes and citation omitted).

[86] *See also Burton v. Freescale*, 798 F.3d at 239-40 (5th Cir. 2015) (holding that lack of documentation may be evidence of pretext); *Asmo v. Keane, Inc.*, 471 F.3d 588, 594-95 (6th Cir. 2006) (plaintiff fired two months after disclosure of pregnancy). Defendant relies on *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 966 (5th Cir. 2016) to argue that temporal proximity alone is insufficient, but unlike the plethora of pretext here in addition to temporal proximity, the record in *Fairchild* was 'replete' with legitimate, non-discriminatory reasons for termination: contentious relationship with her manager; the problems she caused regarding store morale and customer service; and repeated performance-related problems that resulted in warnings—all of which plaintiff failed to rebut, relying solely on evidence of temporal proximity. *Id*. at 967-68.

[87] Ex. 4, FMLA Request; Ex. 19, Jurcak Dep. at 63:7-64:19 (Plaintiff informed on January 29th that her job was eliminated, she would go on FMLA, and her employment would end upon return from FMLA on April 30th).

Plaintiff's pregnancy leave ended in April and Defendants reopened the position in June.[88] Defendants did not consider Plaintiff a legitimate candidate for DOM by July 2018.[89]  In other words, all relevant decisions in this case were made either during pregnancy and FMLA leave, or within four months of it.  Four months is sufficiently short to show causation through temporal proximity, provided Plaintiff can show any other single instance of pretext.  *Feist*, 730 F.3d at 454.

### b.  Contradictions Identifying Decisionmakers

Where there are clear "inconsistencies, incoherences, or contradictions" in Defendants' identifications of the persons involved in the decision to end Plaintiff's employment, that is sufficient to raise a genuine issue of material fact as to whether Defendants reasons are pretextual. *See U.S. ex rel. Sharp*, 2013 U.S. Dist. LEXIS 154646, at \*44-45; *Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002) (an employer's inconsistent explanations for its employment decisions at different times permits a jury to infer that the employer's proffered reasons are pretextual).  Here, there are significant inconsistencies in sworn testimony between Omni and its own top-level decisionmakers about who was involved in the critical decisions at issue.

First, in their EEOC Position Statement, Defendants did not identify ***anyone*** involved in the RIF decisions.[90]  Then, in answers to interrogatories, Omni was unable or unwilling to identify any individuals involved in making the key decision in this case to fire Plaintiff.[91]  In its amended answers, Omni finally identified four people, David Jurcak, Sylvia Deer, Barbara Doucet, and Andrew Casperson, as the only people involved in the RIF decisions.[92]

---

[88] Ex. 24, Smith Dep. at 115:19-24.
[89] *See* Ex. 25, Teague Dep. 1 at 198:4-7; Ex. 24, Smith Dep. at 118:6-22; Ex. 23, Oram Dep. at 43:7-12.
[90] *See* Ex. 10, Omni Position Statement.
[91] *See* Ex. 8, Omni First ROG Responses at No. 4.
[92] Ex. 8, Omni Amended ROG Responses at No. 4; Ex. 12, Omni Verification of Amended ROG Responses.

Ultimately, Omni's sworn answers are contradicted by its key witness, David Jurcak, who first testified that he alone made the decision to eliminate Plaintiff's position, but then that he presented it for approval and agreement to Stephen Rosenstock and Human Resources, discussed positions to be eliminated with HR Director Joy Rothschild and Kurt Alexander, reviewed the RIF list with Director of Finance Tom Chagnon, and further identified Caryn [Kboudi] and Allie as "the people I worked with most during this process."[93]   In other words, Jurcak swore Rosenstock, Rothschild, Chagnon, and others were involved, but Omni swears otherwise.   Jurcak also swore Andrew Casperson was ***not*** involved, while Omni swears Casperson was.[94]   Omni denies its own HR Director Rothschild was involved despite text message between Rothschild and Jurcak about firing Plaintiff that show her direct involvement.[95]   Neither Jurcak nor Omni admitted Carissa Smith's involvement, yet she testified she selected members of her sales team to include, knew the DOM position would be included, and participated in RIF discussions with Jurcak.[96]   Because there is conflicting testimony about *who* made the decision to separate the pregnant employee and retain all the non-pregnant Extended EC members, summary judgment is improper.

### c.   Comparators All Kept Omni Jobs

The comparators are the Extended EC members, all of whom kept their jobs or Jurcak reassigned, except Plaintiff.   *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260–61 (5th Cir. 2009) ("[i]t is sufficient that the ultimate decisionmaker as to employees' continued employment is the same individual, even if the employees do not share an immediate supervisor."   *Kinsella v.*

---

[93] Ex. 19, Jurcak Dep. at Jurcak Dep. at 56:23-57:9; 66:6-68:4, 71:13-21, 72:18-24, 75:7-22; *see* Ex. 8, Omni Amended ROG Responses at No. 4.

[94] *Id*. at 66:6-22.

[95] Ex. 6, Jurcak Rothschild Texts.  Rothschild testified as Omni's Corporate Representative and identified yet a different set of decisionmakers: Jurcak and Casperson, in consultation with corporate HR in Dallas and with in-house counsel Kim Herbert, and "[t]hat's it." Ex. 27, Corp. Rep. Dep. at 11:24-12:10. Hebert was never identified on Defendant Omni's original or amended sworn Answers to Interrogatories.

[96] Ex. 24, Smith Dep. at 12:5-13:25.

*Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003) (plaintiff was only one of eight supervisors not rehired after layoffs).

Before he knew she was pregnant, Jurcak told Plaintiff she was safe during the renovation.[97]  Then once he found out she was pregnant, Jurcak prepared a color-coded list of positions to save or eliminate.[98]  Orange was for managers that already had other positions identified, green was for managers "**we feel we need to find positions for**," and yellow was for issues Jurcak felt he needed to discuss with HR.[99]  Jurcak made the coding decisions but there is no documentation of how or why he made those decisions, and Plaintiff was the only EC or Extended EC member not either orange (other opportunity identified) or green (we feel we need to identify other opportunity).[100]

### d.  Omni's Replacement Was Less Qualified

Hiring a less qualified replacement can constitute evidence of pretext.  *Burrell v Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408 (5th Cir. 2007) (reversing summary judgment in part because plaintiff with purchasing experience was passed over for position that sought "purchasing experience in the bottling industry," for candidate without purchasing experience).

Carissa Smith revised the DOM job description by "redlining" Plaintiff's job description.[101]  Plaintiff met the unchanged requirements for the job she had been excelling in for six years and the newly added "[e]xperience working with a membership base or similar structure is preferred," requirement because of her work for membership at the golf club since 2017.[102]  The

---

[97] Ex. 19, Jurcak Dep. at 48:17-23; Ex. 25, Teague Dep. at 220:1-12.
[98] Ex. 7, Jurcak Spreadsheet Email.
[99] *Id.*
[100] *Id.*; *See* Ex. 22, Omni 000089-000104; Ex. 19, Jurcak Dep. at 102:20-103:1.
[101] Ex. 24, Smith Dep. at 61:15-24; Ex.14, Redline Job Description.
[102] Ex. 14, Redline Job Description. Ex. 25, Teague Dep. at 95:10-99:1.

replacement, Stephanie Baker, was less qualified because she had no hospitality industry experience and never worked with a golf club.[103]  Omni's own Corporate Director of Marketing, Alayna Oram, testified that she "was not immediately sold on hiring" Baker, expressed concerns about Baker as a potential DOM, advised against hiring her, and requested that the search continue.[104]  And Smith said "the original plan was to bring in this high level candidate who would surpass [Plaintiff's] experience.  I'm not sure that we have that."[105]

### e.  Differential Treatment

Jurcak admitted Omni treated Plaintiff differently than other employees because of her pregnancy and FMLA leave.  He testified that "[b]ecause of her pregnancy, unlike anybody else on that list of 33," they postponed her termination from January until April, after her FMLA.[106]

Plaintiff was the only Extended EC member to be notified January 29 that she would be laid off effective in April.[107]  In Jurcak's layoff script for everyone else it says "We have an impending job offer for you at _____ in the position of _____. You may accept this position today or a two-week severance offer."[108]  But he had no job offer for Plaintiff nor any severance offer.

Defendants claim that this differential treatment was actually favorable, to enable Plaintiff to utilize a short-term disability policy.[109]  This is disputed: Plaintiff testified she was treated less favorably because Omni paid her nothing during her FMLA leave, she did not receive healthcare benefits from Omni, and she would have received disability benefits anyway.[110]  Although Omni now calls this plan an "accommodation," it was never discussed with Plaintiff before Omni decided

---

[103] *See* Ex. 24, Smith Dep. at 53:18-54:9; Ex. 27, Corp. Rep. Dep. at 98:22-23, 167:11-14.
[104] Ex. 23, Oram Dep. at 64:5, 65:12-19.
[105] Ex. 2, Carissa Alayna Hiring Emails.
[106] Ex. 19, Jurcak Dep. at 173:6-13.
[107] Id. at 41:8-12.
[108] Ex. 5, Jurcak Layoff Script.
[109] *Id*.; Dkt. 38 at ¶ 28.
[110] Ex. 15, Teague Dec. at ¶ 11.

to implement it, and Plaintiff had no way to consider alternatives.[111]  If Defendants were trying to accommodate Plaintiff, why not offer her the open marketing position, task force, or extended leave until her DOM position reopened?[112]  Would the severance Omni offered to everyone else terminated that day have allowed Plaintiff to receive her disability benefits and have even more flexibility?  Or was the real intent to fire the pregnant worker and hire someone without newborn childcare responsibilities to market the renovated hotel?  These are all questions of fact for a jury.

Omni also treated Plaintiff differently than the other employees laid off on April 30, 2018. On February 26, 2018, Omni HR sent Plaintiff a "WARN" letter to that stated "[w]e will work with you to identify potential opportunities at other Omni properties."[113]  But, contrary to policy and assertion, Omni never worked with Plaintiff to identify potential opportunities at other Omni properties, as it did for non-pregnant employees, including people not on the Extended EC.[114]

### f.   Statements by Decisionmakers

An oral statement exhibiting discriminatory animus may demonstrate pretext. *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 225-26 (5th Cir. 2000). Jurcak, the decisionmaker, made statements that demonstrated his disregard for and impatience with Plaintiff's pregnancy, which were not stray remarks. Jurcak questioned why Plaintiff declined to race go-karts, showing a disregard for her pregnancy and the ways it might interfere with Omni activities.[115] Then, a month before she would get fired then give birth, Jurcak refused Plaintiff's request for a permit

---

[111] *Id*.
[112] *Id*. at ⁋ 12.
[113] Ex. 26, Teague Prod. Ex. at Teague000182.
[114] Ex. 15, Teague Dec. at ⁋ 13; Ex. 22, Omni Prod. Ex. at Omni000809. Omni contends Teague made no effort to visit job fairs, Dkt 38 ¶ 5, but those fairs took place in-person during her FMLA leave, during the time Omni told her not to check work email, Omni did not send notices of the job fairs to her private email, and in any case these job fairs had no director-level marketing positions. Ex. 27, Corp. Rep. Dep. 18:12-19:3; Ex. 15, Teague Dec. at ⁋ 16.
[115] Ex. 25, Teague Dep. at 218:9-219:25; Ex. 19, Jurcak Dep. at 56:23-57:9; 66:6-68:4.

that would allow her to park closer to her office, telling her "No, you're pregnant, not disabled,"[116] again showing a disregard for Plaintiff's pregnancy and the ways Omni might have to accommodate it, [117] by the Omni manager who put her in the RIF.[118]

      Smith, Plaintiff's supervisor who recommended against advancing Plaintiff in hiring the DOM position,[119] told Plaintiff on the day she was notified of her termination that "well, now you'll have more time with your baby."[120] This again is indicative of a animus towards Plaintiff's intent to work after her pregnancy and the stereotype that Plaintiff's place is at home with her children rather than at work or that she would not be able to keep up the pace at the newly renovated hotel while caring for a baby at home.[121]

### g. Omni Failed to Follow Its Own Standard Operating Procedure

      Failure to follow company procedures can constitute evidence of pretext. *See e.g., Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354 n. 29 (5th Cir. 2005) (failure to follow an internal company policy that should be "followed in most circumstances" raises an inference of pretext); Feist, 730 F.3d. at 454-55 (pretext may be shown from "an employer's departure from

---

[116] Ex. 25, Teague Dep. at 242:19-243:13.

[117] *Id*. at 224:6-7.

[118] Ex. 19, Jurcak Dep. at 56:23-57:9; 66:6-68:4. Defendant contends the statements cannot be evidence of pretext. Dkt. 38 at ¶ 24. But Jurcak's statements go directly to the central fact in this case—Plaintiff's pregnancy and animus towards or disregard of it by the decisionmaker.

[119] Ex. 23, Smith Dep. at 127:5-20 ("I did not recommend her for the position.").

[120] Ex. 25, Teague Dep. at 224:8-10, 254:3-23.

[121] Ex. 25, Teague Dep. at 254:17-23. Defendant incorrectly asserts that Plaintiff conceded that the comments were not evidence of discrimination. Dkt. 38 at ¶ 22 This misstates Plaintiff's testimony: she clearly and repeatedly asserted that she felt the comments "showed a disregard for my pregnancy." Ex. 25, Teague Dep. at 218:14-17 ("And I believe that there were two other incidences that not necessarily—I—**at the time**, I didn't believe they were discriminatory, **but showed a disregard for my pregnancy**.") (emphasis added). Defendant argues that Smith's comment cannot demonstrate discriminatory animus because she did not make the RIF decision and has previously taken FMLA leave for pregnancy, but her leave was long before Jurcak or Raessler—the ultimate decisionmakers in the termination and re-hiring decisions—were at the Resort, *See* Ex. 24, Smith Dep. at 9:21-10:10 (children are 16 and 10); Ex. 19, Jurcak Dep. at 11:12-16 (worked at the Resort for two-and-a-half years); Ex. 27, Corp. Rep. Dep. at 87:5-8 (general manager of resort when Stephanie Baker was hired was Todd [Raessler]), and Smith was the manager who decided not to advance Plaintiff in the interview process during the re-hiring. Ex. 24, Smith Dep. at 127:5-20 ("I did not recommend her for the position.").

typical policies and procedures"). Omni's corporate representative admitted Omni failed to follow its own standard operating procedure during Plaintiff's termination where it failed to fill out a termination checklist which included the termination date and whether Plaintiff was rehire-able.[122] This is critical here, where Jurcak and Smith led Plaintiff to believe Omni would rehire her once the position reopened, but Omni's own contemporaneous records suggest they would not.

### B.    FMLA

Plaintiff Teague asserts two FMLA claims: interference under 29 U.S.C. § 2615(a)(1) and retaliation claims under 29 U.S.C. § 2615(a)(2). *Nero v. Industrial molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999).

### 1.    Defendants retaliated against Plaintiff for FMLA leave

#### a.  Prima Facie Case

In order to establish a *prima facie* case of retaliation under the FMLA, Plaintiff must show that: (1) she was protected under the FMLA; (2) she suffered an adverse employment action; and (3) either (a) she was treated less favorably than an employee who had not taken FMLA leave, or (b) the adverse decision was made because she took FMLA leave. *Mauder v. Metropolitan Transit Authority of Harris County, Tex.*, 446 F.3d 574, 583 (5th Cir. 2006). Defendants dispute only the third element, causation.

Plaintiff demonstrated the *prima facie* case under 3(a) because Jurcak, the decisionmaker, singled out the pregnant Plaintiff as the only person he determined would lose their job at Omni without any offer of severance. It is established under 3(b) because temporal proximity is

---

[122] Corp. Rep. Dep. at 69:4-24; Omni 107.

concurrent, Omni notified her of termination the week before her FMLA leave was to start and her illusory last day at work was her scheduled return day from FMLA leave.[123]

### b.   Legitimate Nondiscriminatory Reason

We assume for sake of argument the proffered reasons are the same as above.

### c.   Pretext

Plaintiff can establish that Defendant's proffered reasons are pretextual for the same reasons as stated above, with regard to her pregnancy.

### 2.      Defendants Interfered with Plaintiff's Return

To establish an FMLA interference claim, Plaintiff must show that (1) she was an eligible employee, (2) Omni was subject to FMLA requirements, (3) she was entitled to leave, (4) she gave proper notice of her intention to take FMLA leave, and (5), Omni denied her the benefits to which she was entitled.  Defendant does not appear to contest the first four elements.[124]

Omni contends that Plaintiff cannot provide evidence to create a fact issue as to whether Omni denied her the benefits to which she was entitled under the FMLA.[125]  The FMLA provides that on return to work from FMLA leave, "an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment…even if his or her position has been restructured to accommodate the employee's absence."  29 C.F.R. § 825.214(a).  The regulations provide the position must have "the same or substantially similar duties and responsibilities which

---

[123] Ex. 4, FMLA Request; Ex. 19, Jurcak Dep. at 63:7-64:19 (Plaintiff informed on January 29th that her job was eliminated, she would go on FMLA, and her employment would end upon return from FMLA on April 30th).
[124] *See* Dkt. 38 at ¶¶ 32-33.
[125] *Id*.

must entail substantially equal effort and skill." 29 C.F.R. § 825.215(a). Failure to return the employee to the same or substantially equivalent position constitutes interference.[126]

Defendants did not reinstate Plaintiff to the same or equivalent position with substantially similar duties when she returned from FMLA leave, she had no duties other than to clean out her office.[127] Jurcak testified that Plaintiff's position was done *before* she returned.[128] Plaintiff asked Smith, her supervisor, "[d]o you need me to do anything workwise on Tuesday? Otherwise, I'll just pack up my office and turn in my computer."[129] Smith confirmed that Plaintiff had no duties when she "returned" on her last day: "No, I don't think there is anything I need you to do."[130] Not only was Plaintiff not returned to a position with the same or substantially similar duties or responsibilities, she was given *no* position and *no* duties upon her return.

### C.   After-Acquired Evidence Defense

#### 1.   Defense Unavailable When Discriminatory Decision *Predates* Alleged Misconduct

The equitable after-acquired evidence defense is not a defense to liability, but only a potential defense to the continued aggregation of back pay. "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of

---

[126] Courts have recognized that an employer's supposed restoration of the employee following FMLA leave and subsequent termination after a short period of time will be considered an "illusory" restoration, giving rise to an interference claim under the FMLA. *See Campbell v. Bambro Healthcare, Inc.*, 478 F.3d 1282, 1288 (10th Cir. 2007) (foreclosing interference where restoration was illusory would create "a perverse incentive for employers to make the decision to terminate during an employee's FMLA leave, but allow the employee to return for a brief period before terminating her so as to insulate the employer from an interference claim"); *Stephens v. Neighborhood Serv. Org.*, 07-11908, 2008 WL 3913926 (E.D. Mich. Aug.19, 2008) (rejecting argument that interference claim failed because employer had restored plaintiff to her position for some period of hours before terminating her at end of day).

[127] Ex. 17, Teague Smith Last Day Texts.

[128] Ex. 19, Jurcak Dep. at 61:13-17 ("But I would like to make it clear that her position was no longer needed as of January 29th. Because she was on FMLA during that period of time."), 96:2-9 ("And then when she came back, that her job would still be eliminated because it was being eliminated in January. Her position was eliminated.").

[129] Ex. 17, Teague Smith Last Day Texts.

[130] *Id.*

such severity that the employee in fact would have been terminated on those grounds alone **if the employer had known of it at the time of the discharge**." *McKennon v. Nashville Banner Publ. Co*., 513 U.S. 352, 362-363 (1995).  In other words, the employer has the burden of showing that the employee engaged in misconduct so severe before the discharge decision that it would have fired the employee for that misconduct, if known at the time it occurred.

But here, Defendant's discriminatory discharge decision *predates* the alleged misconduct. It is undisputed that Defendants made and communicated to Plaintiff the decision to terminate her employment in January 2018 *before* any of her alleged misconduct occurred.[131]  Without Defendants terminating her employment, Plaintiff would not have sought out replacement employment later that year, which is the alleged misconduct at issue.[132]

Omni's argument requires the Court to find, contrary to *McKennon's* plain language and as a matter of law, that the after-acquired evidence defense applies when the alleged misconduct occurs *after* a termination decision is made but *before* the final day of work.  Defendants cite no cases so holding.  At least two cases hold the opposite.  *Nesselrotte v. Allegheny Energy, Inc*., 2007 U.S. Dist. LEXIS 79147, at *24 (W.D. Penn. 2007); *Ryder v. Westinghouse Electric Corporation*, 879 F. Supp. 534, 537 (W.D. Penn. 1995).[133]

## 2.    The Appropriate Damages Cut-Off Date is the Date of Discovery

Defendants also ask the Court to incorrectly apply this doctrine, which "calculate[es] backpay from the date of the unlawful discharge **to the date the new information was discovered.**" *McKennon* 513 U.S. at 362 (emphasis added).  Defendant incorrectly suggests April

---

[131] Ex. 19, Jurcak Dep. at 95:22-96:11 ("[I]t was being eliminated in January. Her position was eliminated.")
[132] Ex. 15, Teague Dec. at ⁋ 19.
[133] *See also Thompson v. Tracor Flight Systems, Inc*., 86 Cal. App. 4th 1156, 1172, 104 Cal. Rptr. 2d 95 (Cal. App. 5th Dist. 2001).

2, 2018 (the date she started work for Marriott) as the cutoff date, but the proper cutoff date is the date of discovery of the purported conduct, which Defendants do not specify.[134]  However, their Motion's Appendix cites to Plaintiff's second deposition on September 8, 2020, at which Plaintiff was questioned extensively on this issue.[135] If the Court applies the after-acquired evidence defense to any of Plaintiff's damages, the cutoff date should be September 8, 2020.

### D. Punitive Damages

Punitive damages under Title VII are appropriate where the employer has engaged in discrimination and has done so "with malice or with reckless indifference to the federal protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).  Defendants contend there is no evidence of malice or reckless indifference to Plaintiff's federally protected rights.[136]

### 1. Cover-Up

Omni consciously covered up blackballing Plaintiff Teague as shown in in emails between Smith and Oram.[137] Smith wrote "I stalled her for about a month after she applied and then met with her on July 6."[138] Oram admitted "the Resort did not want to hire Julia back."[139]  After removing everyone but Smith from an email chain, Oram wrote to Smith "**I am hoping they eliminated her and that's why I never saw her application.**"[140]  This is evidence of conscious wrongdoing sufficient to support punitive damages.

---

[134] Dkt. 38-3 at ⁋ 56 ("[d]uring the discovery period.").
[135] *See* Dkt. 38-3 at ⁋ 56 n.176.
[136] Dkt. 38 at ⁋ 63.
[137] *See* Ex. 2, Carissa Alayna Hiring Emails.
[138] *Id.*
[139] Ex. 23, Oram Dep. at 51:20-23.
[140] Ex. 2, Carissa Alayna Hiring Emails (emphasis added).

### 2. Lack of Training

Lack of non-discrimination training can also support punitive damages. *See Abner v. Kansas City S. R. Co.*, 513 F.3d 154, 165 (5th Cir. 2008). Jurcak testified that in his almost 24 years at Omni, he could not remember ever receiving training specifically on pregnancy or FMLA discrimination.[141] If Defendants failed to train their decisionmakers, then there is at least a fact question for a jury as to whether they were recklessly indifferent of the law.

## V. CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that the Court deny Defendants' Motion for Summary Judgment and grant any additional relief that is necessary or proper.

---

[141] Jurcak. Dep. 11:9-11, 14:18-23.

Respectfully Submitted,

KAPLAN LAW FIRM, PLLC
406 Sterzing Street
Austin, Texas 78704
Telephone: (512) 553-9390
Telecopier: (512) 692-2788
www.kaplanlawatx.com

By: Austin Kaplan
State Bar No. 24072176
akaplan@kaplanlawatx.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of October 2020, I served a true and correct copy of the above and foregoing to all counsel of record as follows:

*Via CM/ECF*:

Rachel Powitzky Steely
rsteely@foley.com
Taylor Appling
tappling@foley.com
Foley Gardere
Foley & Lardner LLP
1000 Louisiana, Suite 2000
Houston, Texas 77002
PH: 512.344.4700
FX: 512.344.4701

Austin Kaplan